2 P.3d 725

STATE of Hawai'i, Plaintiff–Appellee,

v.

Bernardo REYES, Defendant–Appellant.

No. 21944.

Intermediate Court of Appeals of Hawai'i.

May 19, 2000.

Jon Ikenaga (argued) (Rose Anne Fletcher, on the brief), Deputy Public Defenders, for Defendant–Appellant.

Caroline M. Mee, (argued) Deputy Prosecuting Attorney, City & County of Honolulu, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and ACOBA, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Bernardo Reyes (Reyes) appeals the circuit court's September 18, 1998 Order of Resentencing. We vacate and remand for further proceedings consistent with this opinion.

## BACKGROUND

At the time of trial in October 1997, Reyes was forty-five years of age. In 1992–93, Reyes was living with the mother (Mother) of a daughter (Daughter) born in 1976. Daughter testified in relevant part as follows:

Q. Now, between the years—between your sophomore year, March, 1992, through March of 1993, was [Reyes] living with you?

A. Yes, he was.

Q. Now, did he—over the course of that year, just in that time period, did he sexually assault you?

A. Yes, he did.

Q. Was this on a regular basis, or was there just a few times?

A. It was—it gradually became regular.

Q. Why didn't you report any of this to [Mother]?

A. I was afraid.

On February 9, 1995, a grand jury indicted Reyes for the following counts:

Counts 1, 2, 3, 4—Sexual Assault in the First Degree, Hawai'i Revised Statutes (HRS) § 707–730 (1993);

Counts 5, 6, 7—Sexual Assault in the Third Degree, HRS § 707–732 (1993); and

Counts 8, 10, 11, 12, 13—Sexual Assault in the Second Degree, HRS § 707–731 (1993).

With respect to all counts, Daughter is the alleged victim-complainant. Counts 1, 2, 3, 4, 5, 6, and 7 allegedly occurred on March 1, 1993. Count 8 allegedly occurred on February 26, 1993. Counts 10 and 11 allegedly occurred on December 1, 1992. Counts 12 and 13 allegedly occurred on March 1, 1992.

The jury hung on Counts 1, 2, 3, 4, 5, 8, 10, 11, 12, and 13.

Count 6 alleged that Reyes violated HRS § 707–732(1)(e) (knowingly by strong compulsion having sexual contact with another person) by placing his hand on Daughter's breast. Count 7 alleged that Reyes violated HRS § 707–732(1)(e) by placing his hand on Daughter's vagina. On November 10, 1997, the jury found, with respect to Counts 6 and 7, that Reyes was guilty of the included offenses of Sexual Assault in the Fourth Degree (knowingly subjects another person to sexual contact by compulsion).

At the February 6, 1998 sentencing hearing, the court stated in relevant part as follows:

[THE COURT]: But the bottom line is he was convicted of touching, without consent, this victim. He's already done 65 days in jail. If I gave him the maximum terms on these two misdemeanors and ran them consecutively, I still doubt [Reyes] would receive any sort of treatment while in custody....

. . . .

... I'm going to proceed on the basis that he's guilty of at least this, touching the complainant without her consent. And he needs to participate in sex offender treatment and I think the best way to get him in there is to give him probation and make sex offender treatment a requirement of probation.

And Mr. Reyes has to understand that if he goes back into treatment, that I don't think denials are going to get him very far. Part of the program is the taking of polygraph examinations and that sort of thing and he's going to be expected to comply with each and every requirement of the sex offender treatment program. And if he does adopt an attitude of resistance and denial, then he's going to probably end up back in court before me. And at that point in time, maybe the prosecutor's recommendation of a whole year in jail may make— may be very, very much more persuasive.

But at this point, given what I've already said, I'm going to place [Reyes] on probation for a year in each of these counts subject to all of the mandatory terms and conditions of probation and the following special conditions:

. . . .

He will participate satisfactorily in the Hawaii Sex Offender Treatment Program with the provision that he obtain and maintain sex offender treatment as approved by the Adult Probation Division at his own expense until clinically discharged with the concurrence of the Adult Probation Division....

. . . .

He is to submit to polygraph examinations as deemed appropriate by the Adult Probation Division and/or his therapist to be paid at his own expense.

. . . .

Okay. Mr. Reyes, did you hear all of the conditions that I've just read?

[REYES]: Yes, Your Honor.

THE COURT: You need to comply with all of them and that includes the sex offender treatment.

Anything further?

[DEPUTY PUBLIC DEFENDER]: Yes, Your Honor. Since the Court has ordered sex offender treatment, which I will submit to the Court is appropriate in this particular case for this particular charge, the only way—my understanding is the only way that a person can successfully complete the program, which is the

order of the Court, is to make certain admissions at some point in time.

My fear is that because of these other pending matters,[1] that it may be required upon Mr. Reyes to make certain admissions regarding those cases as well. And since he still is potentially going to trial, there's a danger there.

I would ask the Court, if the Court would consider a stay of execution for a period of 30 days, at which time Mr. Reyes will make a determination about his possible appeal in this case and hopefully by that period of time there will be a decision made on the other case as well. That way we won't present the possible problem.

THE COURT: ... I probably would be willing to stay the execution of sentence in this case pending the outcome of the remaining charges, period ....

. . . .

THE COURT: It's either that or I've got to cut some sort of exception or give him a privilege for admissions during the course of the treatment sessions. I've done that in the past as well. You know, said that nothing he says during the treatment sessions can be used against him.

. . . .

THE COURT: I'd rather get him into treatment quickly.

. . . .

THE COURT: Okay. All right. We'll add a proviso then to the sex offender treatment requirement that nothing [Reyes] says during the course of treatment can be used against him in—in proceedings on—in this case or any other case.

. . . .

THE COURT: Okay. And that means you've got to participate meaningfully, Mr. Reyes, for your own good because I've seen it happen. If you get stubborn, then you come back and it usually doesn't end happily for anybody. So try your best. (Footnote added.)

The February 6, 1998 Judgment sentenced Reyes to one year of probation upon conditions, some of which were as follows: [2]

B. be committed to the custody of the Director of the Department of Public Safety for a period of 65 days of jail confinement, with credit for time served;

C. participate satisfactorily in the Hawaii Sex Offender Treatment Program (HSOTP) with the provision that you obtain and maintain sex offender treatment, as approved by the Adult Probation Division (APD), at your own expense until clinically discharged with the concurrence of the APD; monthly progress reports are to be submitted to the APD by the therapist. If deemed by the APD to be financially unable to pay, you shall participate in treatment by a Judiciary contracted therapist with payment to be made in accordance with the APD payment formula. Any statements made or documents signed by the defendant in connection with his participation in the HSOTP may not be used against him in this case (Cr. No. 95–0302) or any other proceeding;

D. submit to polygraph examinations, as deemed appropriate by APD, and/or your therapist, to be paid at your own expense[.]

The HSOTP is mandated by HRS Chapter 353E (1993). The HSOTP to which Reyes was referred was the sex offender treatment program provided by Joseph Giovannoni, Inc. (JGI) (JGI's HSOTP). JGI's booklet (JGI's Booklet) explaining this sex offender treatment program is entitled, "The Presence of Love." It states in relevant part as follows:

Relapse prevention requires that the client take responsibility for his offense by admitting to the salient events surrounding

---

1. It appears that the reference to "these other pending matters" is a reference to the ten counts which the jury was unable to decide.

2. The terms and conditions of probation are attached to the February 6, 1998 Judgment. On the bottom of the form, there is a space for the defendant's signature under the words: "The foregoing terms and conditions of probation have been explained to me; I fully understand them, agree to abide by them in every way and understand the consequences. I have received a copy of these terms and conditions of probation." There is no signature on the form.

the sexual assault. Then and only then, will he be able to meet the objectives of the program which are to: 1. Correct the thinking errors that justified the assault, 2. Make an appropriate apology to his victim, 3. Identify his sexual arousal pattern and 3.[sic] Understand his cycle of abuse. Without an admission of the sexual offense, these goals cannot be met.

Joseph Giovannoni (Giovannoni), the administrator of JGI's HSOTP, testified in relevant part as follows:

Q. Good afternoon, Mr. Giovannoni. Can you tell the Court what your current occupation is, licenses you may have and so forth, certifications.

A. Okay. I'm a certified clinical nurse specialist, and a certified criminal justice specialist.

Q. And are you familiar with the Hawai'i Sex Offender Treatment Program?

A. Yes, I am.

Q. And what is your familiarity with that program?

A. I have contracts with the Judiciary to administer the relapse prevention model, as well as—I have contracts with the Judiciary, State of Hawai'i, and also the Department of Public Safety, to administer the relapse prevention model.

Q. And that's for convicted sex offenders.

A. That's correct.

Q. And how long have you been on contract with the Judiciary and the Department of Public Safety to administer this type of treatment to convicted sex offenders?

A. For the past seven years.

JGI's Booklet identifies "Joseph Giovannoni, Inc." as a "Certified Clinical Criminal Justice Specialist" and a "Certified Sex Therapist." It also identifies "Joseph Giovannoni M.A.,M.S.,R.N.,C.S.,Inc."

Giovannoni testified in relevant part as follows:

Q. Now, if you have a person who does not admit to the salient events that constitute the sexual assault, is that in and of itself a reason to terminate him from the program?

A. It is. Because there is no way that the goals of relapse prevention can be met.

Q. Could you explain that a little further?

A. How can someone apologize to a victim if he says he didn't do anything wrong? How can someone correct his thinking errors that justified his behavior if he says he didn't do it? He doesn't have any thinking errors. How does he ever understand the cycle of abuse and all the components that leads to the target, to the grooming, to the planning, if he says he never did it? It puts him at risk of reoffending. That's why so many sex offenders without treatment have extreme recidivism rates.

And how can he possibly understand how to correct his arousal pattern if he doesn't admit that for a period of time, for a specific target, he has developed an unusual sexual interest that may be contrary to social mores and unacceptable, and also damaging to children if it's sexual abuse of children, or sexual arousal to children?

Q. Now, do you administer any type of polygraph tests to him at this point, if a person continues to deny, in an effort to have him take responsibility?

A. We do.

Q. What happens if he passes these polygraph tests?

A. Well, if he passes ... is just one measure. It's not the only thing that we use in trying to support the treatment. If the client passes the polygraph, it depends on what he passes. You know, we're concerned about the questions. We also use the polygraph to make sure that they're complying to avoiding high risk situation to the treatment program.

So if the person passes the polygraph, are you asking if he passes the polygraph and indeed supports his truth that he did not commit the offense? Is that what you're asking?

Q. Right. Yes.

A. I would look a lot closer at why this man is in my group. I would probably do

another polygraph, which I always do, even in cases of deception, from another independent polygraphist. And I would look very closely to see if there may be a problem here, there may be an error in conviction. I don't know. But that's not really my role. I would simply refer it back to the system, primarily Adult Probation, and say that this man is passing the polygraph.

And there's other tests that can be done to determine whether the person has sexual interest and so forth. So if he tells the truth, he supports his truth and we look a little deeper into what's going on.

Giovannoni further testified that Reyes denied committing the crimes for which he was convicted; that even when Reyes was confronted with the results of a polygraph[3] administered by "Michael O'Rien (phonetic)"[4] which indicated that he lied regarding his denial, Reyes continued his denial; that in the April 24, 1998 polygraph test, Reyes was completely deceptive in his answers to questions specifically relating to sex offenders issues; and that in the June 15, 1998 polygraph test, "[Reyes] passed all the other questions, with the exception of do you masturbate to fantasy of touching or having sex with the young girls, which suggests to me that he may be grooming sexual fantasies still of his target age. And that's part of the cycle of abuse."

After this second polygraph test, Reyes submitted, at Giovannoni's request, to an Abel Assessment for Sexual Interest. Giovannoni pointed out some of the responses by Reyes during this assessment:

And one was, okay, for instance he agreed with statements such as one would only do harm by having sex with a child if they use physical force. The other cognition that he demonstrated was children often lie about being sexually abused, which he continued to say about his own victim. Sex education should only be taught by a child's parents. And the relationship between father and child will only be weakened should they have sex together. Would not be weakened, excuse me. Would not be weakened. Underline "not."

According to Giovannoni, during the third polygraph test of Reyes in July, Reyes continued to show signs of sexual deviance:

Mr. Reyes showed an unusual excessive lack of—and self disclosure in his self report, suggesting either a blatant effort to deny sexual drives and interest as well as common human failings. He self reported exclusive sexual interest in adult female. He said that he was exclusively interested in adult female on one measure, yet indicated aversion to another measure. The results of the test also indicate a strong sexual interest in adult and adolescent females and themes of sadomasochism.

Giovannoni testified that "Mr. Reyes persistently stated that he did not sexually abuse this young girl, and that she lied, and that the reason why she lied is because on occasion he would punish her. That was basically his explanation for why he was, quote, according to him, falsely accused. Or why the girl lied about the sexual abuse." However, Giovannoni further testified that he has "never seen anyone who has been falsely accused projecting blame" and that Reyes "basically expressed a thinking pattern that he was blaming the victim, the girl, for making false allegations."

In his July 7, 1998 progress report, Giovannoni stated that Reyes "is super optimistic that his one year probation will soon expire and that he does not have to deal with his problem."

On July 7, 1998, Marie Bolton (Bolton), Reyes' probation officer, received notice from Giovannoni that Reyes had been terminated

---

**3.** On the subject of the credibility of lie detector tests, the rule in Hawai'i is that

[e]vidence of a lie detector test has no place in the trial of a case. Courts do not consider the polygraph or lie detector sufficiently perfected nor the interpretation of results in its use reliable enough to permit testimony respecting such a test to be admitted in evidence. No rule of evidence could be firmly established than that excluding such testimony.

*State v. Chang,* 46 Haw. 22, 31, 374 P.2d 5, 11 (1962).

**4.** Joseph Giovannoni testified, "I use Mr. Orien because I know he has the expertise, especially in asking questions specifically to sex offenders issues."

from the program and, on July 22, 1998, Bolton filed a motion for revocation of probation and resentencing. After a probation revocation hearing on September 4, 1998, the court decided on September 18, 1998, that Reyes "wilfully violated a substantial condition of his probation." The court also stated in relevant part as follows:

> Okay. We are going to stay the entire sentence in this case for 30 days. We need a day on a Friday for Mr. Reyes to come and report, if the case is not appealed. Or even if it is, we need to resolve this, whether he is going to go ahead and serve his term while the case is on appeal or ask me to stay it.
>
> October 23 at 11:30 a.m.

The September 18, 1998 Order of Resentencing expressly "finds . . . that [Reyes] has inexcusably failed to comply with a substantial requirement of the Judgment setting forth the terms and conditions of probation" and sentenced Reyes to probation for one year. One of the conditions of his new probation was that he "[s]erve a term of imprisonment of six months." Although the written order does not so state, the court orally stated that Reyes was to be given credit for time served. Participation in the HSOTP was not required.

On October 1, 1998, Reyes filed a notice of appeal of the September 18, 1998 Order of Resentencing. The court's October 23, 1998 Order Pertaining to Bail released Reyes on his own recognizance. It implicitly stayed the execution of the prison sentence pending appeal.

## POINTS ON APPEAL

Reyes presents the following points on appeal:

1. The circuit court erred in revoking Reyes' probation based on a finding that Reyes "willfully violated" a substantial condition of probation because the proper standard for revoking probation as set forth in HRS § 706–625(c) is a finding that Reyes "inexcusably failed to comply" with a substantial condition of his probation.

2. The record lacks substantial evidence to support a finding that Reyes' maintenance of his innocence, where his convictions were being challenged on appeal, constituted an inexcusable violation of a requirement of a substantial condition of the order of probation.

## STANDARDS OF REVIEW

■ The circuit court's decision that Reyes failed to comply with a substantial requirement imposed as a condition of the order of probation is a finding of fact. *State v. Lazar*, 82 Hawai'i 441, 443, 922 P.2d 1054, 1056 (App.1996). A finding of fact is reviewed under the clearly erroneous standard stated in *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995).

■ The decision that the failure was inexcusable is a conclusion of law. *Lazar, supra.* A conclusion of law is reviewed *de novo* under the right/wrong standard. *Raines v. State*, 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "A [conclusion of law] that is supported by the trial court's [findings of fact] and that reflects an application of the correct rule of law will not be overturned." *Amfac, Inc. v. Waikiki Beachcomber Investment Co.*, 74 Haw. 85, 119, 839 P.2d 10, 29 (1994) (citation omitted).

## DISCUSSION

### 1.

■ HRS § 706–625(3) (Supp.1998) states in relevant part as follows: "The court shall revoke probation if the defendant has inexcusably failed to comply with a substantial requirement imposed as a condition of the order[.]" At the conclusion of the probation revocation hearing, the circuit court stated that Reyes "willfully violated a substantial condition of his probation." In contrast, the circuit court's September 18, 1998 Order of Resentencing expressly "finds . . . that [Reyes] has inexcusably failed to comply with a substantial requirement of the Judgment setting forth the terms and conditions of probation[.]"

Reyes argues that the court applied the wrong standard because it found that Reyes "wilfully violated a substantial condition of

his probation," whereas HRS § 706–625(3) permits revocation only "if the defendant has inexcusably failed to comply with a substantial requirement imposed as a condition of the order[.]" Reyes "takes the position that [the written] finding was made only as to the form and is not representative of the standard actually applied in the court's determination of revocation as represented by the transcripts of proceedings."

The court orally found that Reyes "willfully violated" and concluded in writing that Reyes "inexcusably failed to comply." This oral finding and this written conclusion are not contradictory. The written conclusion satisfies the requirement of HRS § 706–625.

### 2A.

HRS § 706–606 (1993) states in relevant part as follows:

**Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:

. . . .

(2) The need for the sentence imposed:

. . . .

(c) To protect the public from further crimes of the defendant; and

(d) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

HRS § 706–624 (1993) states in relevant part as follows:

**Conditions of probation.** . . .

. . . .

Discretionary conditions. The court may provide as further conditions of a sentence of probation, to the extent that the conditions are reasonably related to the factors set forth in section 706–606 and to the extent that the conditions involve only deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 706–606(2), that the defendant:

. . . .

(n) Satisfy other reasonable conditions as the court may impose;

■ Reyes was convicted of sexually assaulting his girl friend's minor daughter. Unless and until that judgment of conviction is vacated or reversed, Reyes is a sex offender, *Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997), and the courts must assume and proceed on the basis that Reyes needs rehabilitation.

■ It is within the court's discretion to sentence a sex offender to probation on the special condition that he/she shall participate in the HSOTP and comply with its requirement that he/she submit to periodic polygraph testing. *State v. Naone*, 92 Hawai'i 289, 301–05, 990 P.2d 1171, 1182–87 (App. 1999).

■ The reason the court placed Reyes on probation was because "he needs to participate in sex offender treatment and I think the best way to get him in there is to give him probation and make sex offender treatment a requirement of probation."

The court expressly and explicitly conditioned Reyes' probation upon his satisfactory participation in JGI's HSOTP, including admitting his sex crime(s).

If Reyes had personally expressly and explicitly agreed to admit his sex crime(s) and to accept probation on that basis, we would have no difficulty in concluding that when Reyes refused to admit his crime(s) and was terminated from JGI's HSOTP, he "inexcusably failed to comply with a substantial requirement imposed as a condition of the order[.]"

If Reyes had insisted upon his innocence and refused to admit his sex crime(s) and to accept probation on that basis, Reyes would have had no basis for arguing that he needed the HSOTP or that he could benefit from the HSOTP and the court would not have abused its discretion if and when it declined to put him on probation and sentenced him to prison.

In this case, however, Reyes did not personally expressly and explicitly agree to admit his sex crime(s) and to accept probation on that basis. Thus, the question is whether,

when Reyes refused to admit having committed the crime(s) and failed to pass the lie detector tests, Reyes "inexcusably failed to comply with a substantial requirement imposed as a condition of the order[.]" Our answer is that the refusal/failure was not done "inexcusably" because (a) the court cannot order Reyes to admit his sex crime(s) and (b) Reyes did not personally expressly and explicitly agree to admit his sex crime(s) and to accept probation on that basis.

### 2B.

In the future, before the courts decide what express and explicit conditions to attach to the probation of a sex offender, we suggest they consider and evaluate the following thoughts and views.

Though not constitutionally required, wider availability of therapy programs offering treatment to such offenders who refuse to admit guilt would allow more offenders who currently are removed from treatment to receive treatment.

... Most courts accept without question the traditional notions that admission of responsibility is a precursor to treatment and some coercive pressure in treatment is effective at gaining such an admission.[5] Other theorists posit that less confrontational treatment is more effective at overcoming denial, and some studies show evidence of effective treatment without focusing on responsibility for a crime....[6] When offenders have testified in their own defense at trial they should be afforded the right to deny that they committed a sex offense in therapy without fearing probation revocation or imprisonment. Modes of treatment previously given little attention by the courts offer effective therapy without focusing on an offender's admission of responsibility and allow more offenders to receive treatment.

. . . .

The Fifth Amendment right against self-incrimination provides us with some of our most treasured protections—preservation of our autonomy, privacy, and dignity against the threat of state coercion. Court-ordered programs that require convicted sex offenders to admit responsibility for the offense of which they were convicted under threat of probation revocation and imprisonment violate these protections. Sentences and approaches to treatment can be modified, though, to preserve the interests protected by the Fifth Amendment while also satisfying the state interest in rehabilitating offenders. Courts and therapists may promote these interests by: (1) insulating offenders in therapy who testified in their own defense at trial with immunity and a protection against penalizing a refusal to admit guilt, and (2) utilizing alternative treatment methods that are less confrontational and less concerned with an initial acceptance of responsibility.

89 J.Crim. Law. & Criminology 347, 350-51, 390-91 (1998) (footnotes in original).

The fault with current practices is not that they value confession, but that, like the inquisitorial systems that have been discussed, they *fetishize* confession. If the therapeutic confession correlates at all with low recidivism rates, it is by no means the only, or even the most important, predictor. The policy and value conflicts between rehabilitation and the zone of indi-

---

5. See *Gollaher v. United States*, 419 F.2d 520 (9th Cir.1969). The court, upon imposing a stiffer sentence because of the defendant's refusal to admit guilt after his conviction, noted that "it is almost axiomatic that the first step toward rehabilitation of an offender is the offender's recognition that he was at fault." *Id.* at 530–31.

6. See Jon J. Kear–Colwell, *Guest Editorial: A Personal Position on the Treatment of Individuals Who Commit Sexual Offenses*, 40 Int'l J. Offender Therapy & Comp. Criminology 259, 261 (1996) (confrontation "makes little or no psychological sense and could be considered antitherapeutic, even damaging"); Anita M. Schlank & Theodore Shaw, *Treating Sexual Offenders Who Deny Their Guilt: A Pilot Study*, 8 Sexual Abuse: J Res. & Treatment 17, 21 (1996) ("safe environment and lack of pressure to admit" to offense facilitate treatment and modification of denial); [Mack E. Winn, *The Strategic and Systematic Management of Denial in Cognitive/Behavioral Treatment of Sexual Offenders*, 8 Sexual Abuse: J. Res. & Treatment 25, 26] (studies have explored various treatment interventions which can be effective in the presence of denial).

330

vidual autonomy will come to a head when and if therapists demonstrate a clear causal connection between coerced confessions and successful treatment outcomes. At that point, it will become necessary to make a difficult political choice: Should our historic aversion to inquisitorial methods yield to claims of social utility? Until then, the Constitution protects the "private inner sanctum of individual feeling and thought," "the inviolability of the human personality" of sex offenders and puritan pamphleteers alike, and the courts must draw lines that the state may not cross in its ambition to cure criminals of the disease of crime.

20 Vt. L.Rev. 951, 999 (1996) (footnotes omitted).

## CONCLUSION

Accordingly, we vacate the circuit court's September 18, 1998 Order of Resentencing and remand for further proceedings consistent with this opinion.

Concurring Opinion of ACOBA, J.

I concur in the result.